UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

FLETCHER INTERNATIONAL, LTD.,

                Debtor.

ALPHONSE FLETCHER, JR.,

                Appellant,

     v.

RICHARD J. DAVIS,

                Appellee.

14 Civ. 09690 (AT)

---

## APPELLEE'S BRIEF

---

Michael Luskin
Lucia T. Chapman
Stephan E. Hornung
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Telephone:  (212) 597-8200
Facsimile:   (212) 974-3205
luskin@lsellp.com
chapman@lsellp.com
hornung@lsellp.com

*Attorneys for Appellee, Richard J. Davis*

## CORPORATE DISCLOSURE STATEMENT
## <u>PURSUANT TO BANKRUPTCY RULE 8012</u>

The Appellee is the Plan Administrator and former Chapter 11 Trustee (the "<u>Trustee</u>" or the "<u>Plan Administrator</u>") for the debtor, Fletcher International, Ltd. ("<u>FILB</u>").  FILB's equity is nominally held by Fletcher International, Inc. Fletcher Income Arbitrage Fund Ltd. ("<u>Arbitrage</u>") owns approximately 97% of Fletcher International, Inc.  FIA Leveraged Fund ("<u>Leveraged</u>") and Fletcher Fixed Income Alpha Fund Ltd. own approximately 76% and 22% of Arbitrage, respectively.

On March 28, 2014, the Trustee's Second Amended Plan of Liquidation (the "<u>Plan</u>") was confirmed by the Bankruptcy Court, and the Plan went effective on April 7, 2014.  Pursuant to the Plan, the Plan Administrator is deemed the sole interest holder of FILB (for all purposes other than with respect to rights of Interest Holders established under the Plan), and the sole officer and director of FILB.  No publicly-held corporation directly or indirectly owns 10% or more of FILB's stock.

# TABLE OF CONTENTS

**Page**

Summary of Argument ................................................................1

Statement of Issues Presented.....................................................4

Statement of the Case ...............................................................5

    A.    Background ...............................................................5

    B.    The Settlement Agreement.........................................9

    C.    Credit Suisse Settlement Procedural History .....................11

        1.    The Motion ....................................................11

        2.    The Bankruptcy Court's Decision ...............................12

        3.    The Current Appeal ..............................................14

    D.    Subordination of Fletcher's Claims Pursuant to the Trustee's Plan of Liquidation.................................................16

    E.    Other Relevant Proceedings.........................................17

        1.    Fletcher's Litigation Against the Dakota ........................17

        2.    The UCBI Appeal and Fletcher's "Conflicts Motion"..............18

        3.    The Disgorgement Motion Appeal.............................21

Standard of Review....................................................................26

Argument ...............................................................................28

I.    The Court Should Reject Fletcher's Appeal.................................28

    A.    The Bankruptcy Court Applied the Proper Legal Standard...............28

    B.    Fletcher Offers No Competent Evidence That the Settlement Was Anything Other Than at Arms' Length.......................................30

    C.    Credit Suisse Undertook a Reasonable Sales Process, and Fletcher Presented No Evidence of a Better or Higher Bid ...............31

    D.    The Settlement Avoided Expensive, Time-Consuming, and Almost Certainly Unsuccessful Litigation.........................................33

Conclusion ............................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.),
  Adv. Proc. No. 14-01923 (REG) (Bankr. S.D.N.Y.)..........................................20

Fletcher v. Ball (In re Soundview Elite, Ltd.),
  Index No. 15-05666 (KPF) (S.D.N.Y.) ...............................................................20

DeRosa v. Chase Manhattan Mortg. Corp.,
  10 A.D.3d 317 (1st Dep't 2004) .........................................................................34

Fletcher v. The Dakota, Inc.,
  Index No. 101298/11 (Sup. Ct. N.Y. Cnty.).......................................................17

Fletcher v. Davis (In re Fletcher International, Ltd.),
  Index No. 14 Civ. 02836 (WHP) (S.D.N.Y.) ............................................... 19, 20

Fletcher v. Davis (In re Fletcher International, Ltd.),
  Index No. 14 Civ. 6070 (RJS) (S.D.N.Y.)...................................... 24, 25, 26, 30

Fletcher v. Davis (In re Fletcher International, Ltd.,
  Index No. 14-1856 (2d Cir.) ........................................................................ 19, 20

Fletcher v. Davis (In re Fletcher International, Ltd.),
  Index No. 15-2991 (2d Cir.) ...............................................................................26

Franklin v. Residential Capital, LLC (In re Residential Capital, LLC),
  No. 13 Civ. 8317 (PAE), 2014 U.S. Dist. LEXIS 60828
  (S.D.N.Y. May 1, 2014)......................................................................................27

In re Drexel Burnham Lambert Group, Inc.,
  134 B.R. 493 (Bankr. S.D.N.Y. 1991)................................................................28

In re Teltronics Serv., Inc.,
  762 F.2d 185 (2d Cir. 1985) ...............................................................................29

In re WorldCom, Inc.,
  347 B.R. 123 (Bankr. S.D.N.Y. 2006)................................................................28

Motorola, Inc. v. Official Comm. of Unsecured Creditors
  (In re Iridium Operating LLC),
  478 F.3d 452 (2d Cir. 2007) ....................................................... 27, 29

Pleasant v. TLC Liquidation Trust (In re Tender Loving Care Health Servs.),
  562 F.3d 158 (2d Cir. 2009) ...............................................................27

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
  390 U.S. 414 (1968).............................................................................28

Saccurato v. Masters, Inc. (In re Masters, Inc.),
  149 B.R. 289 (E.D.N.Y. 1992) ...........................................................28

Strawbridge v. Messer (In re Strawbridge),
  No. 11 Civ 6759 (PAE), 2012 U.S. Dist. LEXIS 29751
  (S.D.N.Y. Mar. 6, 2012) .....................................................................27

Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re Sagecrest II, LLC),
  No. 3:10-cv-978 (SRU),
  2011 U.S. Dist. LEXIS 3517 (D. Conn. Jan. 14, 2011)  ...................30

## STATUTES AND RULES

11 U.S.C. § 363 ......................................................................................28

Fed. R. App. P. 7 ............................................................................... 19, 20

Fed. R. Bankr. P. 9019 ....................................................................... 27, 28

N.Y. U.C.C. § 9-610 ..............................................................................34

N.Y. U.C.C. § 9-627 ..............................................................................34

## Summary of Argument

This appeal by Appellant, Alphonse Fletcher, Jr. ("**Fletcher**") – an Insider of the Debtor, Fletcher International, Ltd. ("**FILB**"), whose claims the Bankruptcy Court deeply subordinated due to Fletcher's fraud – is the latest in a series of obstructionist tactics designed to disrupt the liquidation of the Debtor's estate.  For a second time, Fletcher is appealing to the District Court to challenge a routine settlement undertaken by Appellee, Richard J. Davis, the former Chapter 11 Trustee and now the Plan Administrator of FILB (the "**Trustee**" or the "**Plan Administrator**") in the exercise of his sound business judgment and approved by the Bankruptcy Court as reasonable.

The Plan Administrator determined, in the exercise of his business judgment and in the exercise of the broad discretion afforded him under the Bankruptcy Code to manage the FILB estate, to settle with Credit Suisse in return for approximately $150,000 in cash, rather than pursue lengthy and costly litigation against Credit Suisse with virtually no chance of success.  The Bankruptcy Court determined, in its discretion, to approve the Plan Administrator's exercise of his discretion.  The Bankruptcy Court did so based on the Plan Administrator's uncontradicted testimony about the steps he took to evaluate the potential claims against Credit Suisse, the strength of those claims, and the costs associated with any potential litigation.  Based on this evidence, the Bankruptcy Court found that

the Plan Administrator's decision was reasonable and that it satisfied the applicable legal standard (i.e., it was above the lowest point in the range of reasonableness).

On appeal, Fletcher claims that the Plan Administrator is giving up valuable claims against Credit Suisse arising out of its sale of collateral – certain preferred shares in Ion Geophysical Corporation (the "**ION Shares**") – Credit Suisse held to secure margin loans it made to FILB.  Fletcher claims that Credit Suisse sold the ION Shares to D.E. Shaw at a discount over a "better bid" allegedly secured by FILB.  But the Plan Administrator investigated these claims at Fletcher's request, and found that, in fact, there was no alternative bid and the only bid even being considered was for less money than the bid that Credit Suisse ultimately got, and the undisputed facts are that Credit Suisse obtained a higher price for the ION Shares than Fletcher's own asset management company ever had when it had sold them on prior occasions.

Fletcher also claims that the Plan Administrator's negotiations with Credit Suisse were not at arms' length because of purported "conflicts," but in support he does nothing more than rehash claims that the Plan Administrator and his advisors have supposedly failed to disclose certain conflicts of interest.  There is nothing in the record that supports these fanciful allegations and the Bankruptcy Court and the District Court have already rejected them numerous times.

What is in the uncontradicted record supports the reasonableness of the Plan Administrator's decision to settle and the propriety of the Bankruptcy Court's approval of the Plan Administrator's decision.  The Bankruptcy Court's factual findings establishing the reasonableness of the Plan Administrator's actions were not "clearly erroneous," and the Bankruptcy Court did not abuse its discretion in applying the "range of reasonableness" standard to the undisputed record. Accordingly, the Court should affirm the Bankruptcy Court's approval of the Plan Administrator's settlement with Credit Suisse.

## **Statement of Issues Presented**

1.      Whether the Bankruptcy Court abused its discretion in finding that the Plan Administrators settlement with Credit Suisse was above the lowest point in the range of reasonableness?  We maintain that it did not.

2.      Whether the Bankruptcy Court's findings of fact establishing the reasonableness of the Plan Administrator's decision to settle with Credit Suisse were clearly erroneous?  We maintain they were not.

3.      Whether the Bankruptcy Court properly approved the settlement agreement on the undisputed record without holding an evidentiary hearing?  We maintain that it did.

## Statement of the Case

### A.   Background

FILB was a "master fund" in a master-feeder fund structure controlled by Fletcher.  Prior to the FILB Bankruptcy, Credit Suisse (defined below) was FILB's prime broker.  (Bankr. Dkt. No. 640.)  It had entered into a Customer Agreement, Prime Broker Annex and Credit Annex, all dated as of July 7, 2006 (together with all other annexes, amendments, and supplements thereto, the "**Customer Agreement**") with Credit Suisse Securities (USA) LLC ("**Securities USA**") pursuant to which Securities USA opened and maintained accounts for FILB so that FILB could transact business with Securities USA and its parents, subsidiaries and affiliates, including Credit Suisse Securities (Europe) Limited ("**Securities Europe**," and together with the foregoing entities "**Credit Suisse**"). (Bankr. Dkt. No. 617 ¶ 4.)[1]

FILB and Credit Suisse also entered into several additional related agreements (each a "**Contract**" as defined in the Customer Agreement), including a Multicurrency-Cross Border ISDA Master Agreement between Securities Europe and FILB, dated as of July 7, 2006 (together with the Credit Support Annex and

---

[1] All references to "Bankr. Dkt. No. __" are to the docket in the Bankruptcy proceeding, In re Fletcher International, Ltd., Case No. 12-12796 (REG).

schedules and a Portfolio Swap Annex, the "**ISDA**"), pursuant to which Securities Europe and FILB entered into certain swap transactions (the "**Swaps**").  (Id. ¶ 5.)

The Customer Agreement (i) granted to Credit Suisse "a continuing first priority security interest in, a lien on and a right of set-off against all Collateral" (as that term is defined in the Customer Agreement), and stated that "all such Collateral shall be subject to a general lien and a continuing first security interest and fixed charge in favor of [Credit Suisse], in each case securing the discharge of all Obligations, Contracts with [Credit Suisse] and other liabilities of [FILB] to [Credit Suisse], whether now existing or hereafter arising . . . ."; (ii) required FILB to pay "reasonable legal and other expenses incurred in connection with the enforcement of [the] Contracts"; (iii) made FILB liable to Credit Suisse for "any loss or expense incurred in connection with the exercise of remedies under [the Customer Agreement] following the termination of [the Customer Agreement] or the exercise of any other remedies by [Credit Suisse]"; (iv) required FILB to, inter alia, indemnify and reimburse Credit Suisse for any loss or expense, "including reasonable attorneys' fees and expenses" arising out of or in connection with the Customer Agreement or any other Contract; and (v) was amended by that certain letter agreement (the "**Letter Agreement**"), dated April 3, 2007, between Securities USA, on behalf of itself and as agent for Securities Europe, and FILB to provide, inter alia, that the Customer Agreement "is a 'master netting agreement'

-6-

and that [Securities USA, Securities Europe, and FILB] are 'master netting participants,' each term as defined in Section 561 of the Bankruptcy Code." (Id. ¶ 6.)

In July 2011, Credit Suisse advised FILB that it was terminating the prime brokerage relationship and the Swaps.  Following discussions between the parties, Credit Suisse agreed to hold in abeyance the termination of the prime brokerage relationship and the Swaps to enable FILB to find a replacement for Credit Suisse.  Initially, this consisted of periodic extensions of the termination dates, but in late January 2012, Credit Suisse agreed to an open-ended extension of the termination dates of the prime brokerage relationship and Swaps, subject to revocation on ten days' notice at Credit Suisse's sole discretion.  (Bankr. Dkt. No. 393 at 110; Bankr. Dkt. No. 640 ¶ 10.)

In late May 2012, Credit Suisse advised FILB that it was revoking its consent to the extension of the termination dates for the prime broker relationship and Swaps, and that the termination date would be June 7, 2012.  Credit Suisse cited FILB's failure to deliver 2010 and 2011 audited financial statements and the Cayman liquidation proceedings of Leveraged as reasons for revoking the extension of the termination date.  (Bankr. Dkt. No. 393 at 111; Bankr. Dkt. No. 640 ¶ 10.)

Between June 7, 2012, and June 27, 2012, Credit Suisse liquidated the ION Shares for approximately $39.5 million and paid itself $40 million from the sale proceeds and cash on hand to pay down FILB's margin debt and obligations under outstanding Swaps.  (Bankr. Dkt. No. 393 at 111.)  The purchaser of the ION Shares paid a price that was equal to conversion value plus six months of dividends.  (Bankr. Dkt. No. 640 ¶ 16(a).)  This price was higher than Fletcher's asset management company – Fletcher Asset Management, Inc. ("**FAM**") – had ever received when it previously sold those same shares.  (Id.)

Shortly after FILB's Chapter 11 filing, its then counsel (Young Conaway Stargatt & Taylor, LLP) began negotiating with Credit Suisse over the use of the $1.6 million cash balance in the margin account.  Credit Suisse argued that it was entitled to retain those funds to secure FILB's indemnification obligations.  FILB wanted the funds to be returned.  Following the Trustee's appointment, he concluded negotiations and agreed to a consensual cash collateral order with Credit Suisse.  (Bankr. Dkt. No. 149 ¶ 5; Bankr. Dkt. No. 640 ¶ 11.)

By order dated November 9, 2012 (the "**Cash Collateral Order**"), the Bankruptcy Court approved a stipulation and order pursuant to which Credit Suisse turned over to FILB cash and securities that constituted "cash collateral" under the Bankruptcy Code, and set up certain procedures to provide Credit Suisse with

"adequate protection" as required by the Bankruptcy Code.  (Bankr. Dkt. Nos. 149, 617 ¶ 7.)

Pursuant to the Cash Collateral Order, Credit Suisse retained $595,673.38 in cash (the "**Holdback Amount**"), which it was entitled to withhold (i) to satisfy certain pre-petition legal expenses and (ii) to secure the payment of any post-petition legal expenses that constituted Obligations under the Customer Agreement.  (Bankr. Dkt. No. 617 ¶ 8; see Bankr. Dkt. No. 149.)

Credit Suisse incurred post-petition legal expenses that it was entitled to set off against the Holdback Amount pursuant to the Cash Collateral Order. (Bankr. Dkt. No. 617 ¶ 9.)

At the time of the settlement, Credit Suisse had $206,337.03 in cash and had incurred additional post-petition legal expenses that it had not yet set off. (Id. ¶ 10.)

### B.    The Settlement Agreement

The settlement agreement between FILB and Credit Suisse (the "**Settlement Agreement**") settled all claims related to the Customer Agreement, the Contracts, the ISDA, the Swaps, the Letter Agreement, and the Cash Collateral Order in accordance with the following terms:

- On the Effective Date of the Settlement Agreement, Credit Suisse was required to provide to FILB copies of its invoices and supporting

time and disbursement records for any fees and expenses incurred but not yet set off.  The Parties were to resolve any disputes concerning setoff of post-petition legal fees in accordance with the procedures set forth in Paragraph 15(b) of the Cash Collateral Order.

- Within ten business days of the effective date of the Settlement Agreement, Credit Suisse was required to pay to FILB the Holdback Amount less any set off for post-petition legal fees.

- The Parties were to exchange limited mutual releases of all claims related to or arising out of the Customer Agreement, the Contracts, the ISDA, the Swaps, the Letter Agreement, or the Cash Collateral Order. The releases would not affect any claims that FILB and its feeder funds – Fletcher Income Arbitrage Fund, Ltd., FIA Leveraged Fund, and Fletcher Fixed Income Alpha Fund, Ltd. (together with FILB, the "**Fletcher Funds**") – might have against Credit Suisse arising out of any direct or indirect investments that they have (or had) in the Fletcher Funds.

(Id. ¶¶ 12–15.)

## C.   Credit Suisse Settlement Procedural History

### 1.   The Motion

On August 26, 2014, the Plan Administrator filed a motion to approve the Settlement Agreement.  (Bankr. Dkt. No. 617.)[2]  Only two objections were filed:  one by Fletcher's associate Stewart Turner[3] and one by Fletcher.  Fletcher based his objection on hearsay, speculation, and unsupported argument.  He did not submit sworn direct testimony from himself, from any of the persons or entities referred to or relied on in his objection, or from any experts.   Fletcher relied primarily on Turner's objection – which Fletcher incorporated by reference – and an attached copy of the appellate brief he had filed before District Court Judge Sullivan appealing Bankruptcy Judge Gerber's denial of his unsupported and untimely "Conflicts" and "Disgorgement" motions (described in Section E below).  (See Bankr. Dkt. No. 631.)[4]  Fletcher claimed that Credit Suisse had sold the ION Shares to D.E. Shaw at a discount over a "better bid" allegedly secured by FILB.  (Bankr. Dkt. No. 631 ¶ 5.)  Fletcher also alleged, without any support, that neither

---

[2] Pursuant to the Plan and Confirmation Order, the Plan Administrator could have entered into a settlement agreement with Credit Suisse without seeking court approval.  (Bankr. Dkt. No. 490 ¶ 98.)  The Plan Administrator sought court approval of the Settlement Agreement at Credit Suisse's request.  (Bankr. Dkt. No. 617 ¶ 2.)

[3] The Bankruptcy Court found that Turner participated with Fletcher in the inequitable conduct that led the Bankruptcy Court to subordinate both their claims.  (See Bankr. Dkt. Nos. 490, 558.)  Turner did not appeal the Bankruptcy Court order approving the settlement.

[4] As discussed in Section E.3 below, on September 9, 2015, Judge Sullivan rejected Fletcher's appeal and affirmed the order of the Bankruptcy Court.

the Credit Suisse–D.E. Shaw sale nor the Plan Administrator's settlement with Credit Suisse was negotiated at arms' length.  (Id. ¶¶ 5–7.)

On October 15, 2014, the Bankruptcy Court held a hearing on the Plan Administrator's motion.  Fletcher did not appear at the hearing.  After hearing extensive argument and considering the Plan Administrator's evidence and Turner's objection, the Court made detailed findings of fact and conclusions of law and ultimately approved the Plan Administrator's settlement with Credit Suisse, finding that it fell well within the range of reasonableness.  (Bankr. Dkt. No. 649, Oct. 15, 2014, Hrg. Tr. 29–35.)

### 2.   <u>The Bankruptcy Court's Decision</u>

The Bankruptcy Court rendered its decision from the bench, finding that:

- The supposed alternative bidder – Del Mar Asset Management, LP ("**Del Mar**") – "chose not to submit an offer and that . . . the only bid even being considered by Del [Mar] was for less money than the bid that Credit Suisse ultimately got."  (Bankr. Dkt. No. 649, Oct. 15, 2014, Hrg. Tr. 31:1–5.)

- The settlement was the product of "arm's-length bargaining" and was not a "sweetheart deal."  (Id. 32:19–22.)

- Any litigation against Credit Suisse would have been a "longshot" (id. 33:7), and any portion of the funds remaining from the sale would "dissipate the amount that the trustee could still get" and "go up in smoke." (Id. 30:15–23.)

- The litigation against Credit Suisse would have been "both time-consuming and expensive." (Id. 33:13–15.)

- Both Fletcher and Turner, whose claims had previously been subordinated to other creditors (see Bankr. Dkt. Nos. 490, 558), were advocating that the Plan Administrator "gamble with the other creditors' money" and "try to shoot the moon" with litigation that would have to be wildly successful for Fletcher and Turner to recover anything. (Id. 31:6–19.)

- The Trustee exercised "reasonable judgment" in deciding to accept the settlement with Credit Suisse before the balance dropped to zero. (Id. 33:11–20.)

- No evidentiary hearing was needed because the Bankruptcy Court was able to make its "findings based on the undisputed facts." (Id. 35:3–5.)

The Bankruptcy Court went on to opine that "it is likely, if not certain, that Turner and Fletcher would not be parties aggrieved on this because of the fact

-13-

that they were previously subordinated." (Id. 34:2–4.)  The Court entered an order approving the settlement on October 16, 2014.  (Bankr. Dkt. No. 648.)

### 3.    The Current Appeal

On October 29, 2014, Fletcher filed a notice of appeal.  (Bankr. Dkt. No. 655.)

On October 30, 2014, the effective date of the Settlement Agreement occurred, and Credit Suisse provided the Plan Administrator with copies of its legal bills as it was required to do under the Settlement Agreement.  On November 12, 2014, Credit Suisse wired $154,337.03 to the Debtor.  (Dkt. No. 20 ¶¶ 7–8.) [5]

On November 13, 2014, Fletcher filed his statement of issues on appeal and designation of items to be included in the record on appeal (Dkt. No. 2), and on November 25, 2014, the Plan Administrator filed a counter-designation of items to be included in the record on appeal.  (Dkt. No. 3.)

On December 24, 2014, Fletcher filed his appellate brief. (Dkt. No. 7.)  On the same day, the Plan Administrator requested a court conference to address numerous threshold issues concerning the appeal.  (Dkt. No. 6.)  The Court denied the Plan Administrator's request for a conference and instead ordered the parties to submit further letter briefing.  (Dkt. No. 9.)

---

[5] References to "Dkt. No. __" are to the docket in this appeal.

Both parties submitted letters (Dkt. Nos. 15, 16), and by order dated January 16, 2015, the Court directed the Plan Administrator to file a motion to dismiss.  (Dkt. No. 17.)  On February 6, 2015, the Plan Administrator filed a motion to dismiss Fletcher's appeal on the grounds that Fletcher lacked standing due to the equitable subordination of his claims, that Fletcher had waived his right to appeal by failing to appear at the hearing before the Bankruptcy Court, and that his appeal was, in any event, equitably moot.  (Dkt. Nos. 18–20, 22.)  In his supporting memorandum, the Plan Administrator also addressed the merits of Fletcher's appeal and requested that if the Court were to deny his motion to dismiss, it consider the appeal on the merits and treat his supporting memorandum as his opposition brief.  (Dkt. No. 19 at 1 n.1.)

On September 30, 2015, the Court issued an order denying the Plan Administrator's motion on the grounds of waiver, standing, and equitable mootness and directed the Plan Administrator to file his brief by October 30, 2015. The Court stated that it would issue a memorandum explaining the reasoning behind its decision in due course.  (Dkt. No. 23.)[6]

---

[6] The Court has not yet issued its decision.  To the extent not foreclosed by the reasoning of the Court's decision, the Plan Administrator incorporates Sections II and III of its memorandum of law in support of its motion to dismiss (addressing waiver, standing, and equitable mootness) by reference.  (See Dkt. No. 19 at 20–24.)

### D.      Subordination of Fletcher's Claims Pursuant to the Trustee's Plan of Liquidation

All of Fletcher's claims in the FILB Bankruptcy are deeply

subordinated behind approximately $120 million in unsecured claims.  The basis

for the subordination is laid out in the Trustee's Report and Disclosure Statement

(the "**Trustee's Report**") and Plan of Liquidation (the "**Plan**") filed on

November 25, 2013, and later amended.  (See Bankr. Dkt. Nos. 327, 328, 393.)

The Trustee's Report was the culmination of the Trustee's 14-month investigation

into the affairs of the Debtor, and concluded, among other things, that Fletcher had

engaged in a pattern of intentional fraudulent conduct to the detriment of FILB's

creditors and investors.

The Plan called for the liquidation of the Debtor, and required that

Insider claims – and in particular, Fletcher's claims – be subordinated behind $120

million in allowed unsecured claims.  By order dated March 28, 2014, the

Bankruptcy Court confirmed the Plan, concluding that Fletcher had repeatedly

engaged in inequitable conduct to the detriment of FILB's creditors and investors.

(Bankr. Dkt. No. 490.)  Relying on a detailed declaration filed by the Plan

Administrator (Bankr. Dkt. No. 474), the Bankruptcy Court found that Fletcher had

cost investors and creditors millions of dollars.  Among other things, the Court

found that Fletcher and his colleagues engineered the "April 22 transactions"

(described at length in the Trustee's Report and other Bankruptcy Court filings) in

order to divert millions of dollars in assets away from FILB's creditors and investors; they transferred $4.1 million of FILB's money to purchase shares in Fletcher International Partners, Ltd., solely for the undisclosed purpose of putting this cash into the hands of one of Fletcher's cronies; and Fletcher invested $7.7 million of public pension fund investor money in his brother Geoffrey's movie in violation of an agreement that dictated how the pension fund's money could be invested.  (Bankr. Dkt. No. 490 ¶¶ 82–83.)  That order is final and non-appealable.

### E.    Other Relevant Proceedings

On appeal, Fletcher again raises his unsupported allegations that the Trustee and his advisors have failed to disclose purported conflicts of interest. These claims have been rejected by every court that has considered them, and his latest appeal to Judge Sullivan was denied in a 21-page Memorandum and Order entered September 9, 2015.  They are described below.

### 1.    Fletcher's Litigation Against the Dakota

Fletcher sued the The Dakota Inc. and certain of its board members in 2011 alleging claims of racial discrimination and defamation.  See Fletcher. v. The Dakota, Inc., Index No. 101298/11 (Sup. Ct. N.Y. Cnty.) (Rakower, J.)  On September 11, 2015, the New York County Supreme Court dismissed Fletcher's lawsuit against the Dakota in its entirety.  The Court rejected each of Fletcher's discrimination and defamation claims, finding that Fletcher had failed to raise a

triable issue of material fact with respect to any of them.  As discussed more fully

below, Fletcher has repeatedly alleged without any support that the Trustee and his

advisors failed to disclose connections to the Dakota or the Dakota's board

members, or otherwise suffer from undisclosed conflicts of interest.

### 2.   The UCBI Appeal and Fletcher's "Conflicts Motion"

Prior to confirmation of the Plan, the Trustee had reached a $12

million settlement with United Community Banks, Inc. ("**UCBI**"), a Georgia Bank

in which FILB had invested.  On the morning of the hearing to consider the

settlement with UCBI, Fletcher submitted a letter to the Bankruptcy Court seeking

a stay of all proceedings pending disclosure by various fiduciaries of certain

supposed conflicts.  The Bankruptcy Court denied Fletcher's request as untimely,

directed him to file a proper motion, and on March 20, 2014, approved the

settlement with UCBI over the objection of Turner.  (Bankr. Dkt. No. 465.)  (The

motion Fletcher ultimately filed at the direction of the Bankruptcy Court was the

subject of the appeal before Judge Sullivan and is described more fully in Section

E.3 below.)

Turner filed a timely appeal of the order approving the UCBI

settlement; Fletcher did not.  Instead, Fletcher sought permission to file a late

notice of appeal or, alternatively, to participate in Turner's appeal.  In support of

that motion, Fletcher attached a copy of his so called "Conflicts Motion"

(described more fully below).  (Bankr. Dkt. No. 515.)  Five days later, on April 28, 2014, before the Bankruptcy Court decided the motion, Fletcher filed a letter with the United States District Court, again seeking permission to participate in Turner's appeal.  In support, he attached his motion to file an untimely appeal that he had previously filed in the Bankruptcy Court.  See Fletcher v. Davis (In re Fletcher International, Ltd.), Index No. 14 Civ. 02836 (WHP) (S.D.N.Y.) [Dkt. No. 10].  By order dated May 21, 2014, the Bankruptcy Court rejected Fletcher's motion to file an untimely appeal because he had failed to file a timely objection in the first instance.  (Bankr. Dkt. No. 539.)  In an order dated the same day, Disctrict Court Judge Pauley rejected Fletcher's appeal of that Bankruptcy Court order and denied his request to participate in Turner's appeal.  See Fletcher v. Davis (In re Fletcher International, Ltd.), Index No. 14 Civ. 02836 (WHP) (S.D.N.Y.) [Dkt. No. 16].  Judge Pauley found that the Bankruptcy Court had not abused its discretion by denying Fletcher's request to file a late notice of appeal, and rejected Fletcher's argument that his preoccupation with other lawsuits and his pro se status constituted "excusable neglect."  (Id. at 3.)  By order dated May 29, 2014, Judge Pauley also affirmed the order approving the UCBI settlement.  (Id. [Dkt. No. 22].)

Turner and Fletcher each appealed to the Court of Appeals, and Judge Pauley ordered each to post a costs bond pursuant to Rule 7 of the Federal Rules of Appellate Procedure by August 13, 2014.  (Id. [Dkt. No. 38].)  On August 13,

2014, Fletcher caused a company controlled by him (Richcourt USA Inc.) to post the appeal bonds for both himself and Turner using money Fletcher had misappropriated from another company he controlled (Soundview Composite Ltd.) in direct violation of a Bankruptcy Court order entered in other cases related to the FILB Bankruptcy.  See Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.), Adv. Proc. No. 14-01923 (REG) [Dkt. (the "**Composite Dkt.**") No. 46] (Bankr. S.D.N.Y.)[7]  The costs bonds were eventually vacated, and the misappropriated cash was returned to Soundview Composite, but at a hearing on November 5, 2014, the Bankruptcy Court held Fletcher and several of his colleagues in contempt for their willful violation of the Bankruptcy Court's orders and directed them to pay the Soundview Trustee's legal fees.[8]

Ultimately, the Plan Administrator settled his dispute with Turner, and Fletcher abandoned his appeal.  Both appeals were dismissed.  See Fletcher v. Davis (In re Fletcher International, Ltd., Index No. 14-1856 (2d Cir.) [Dkt. Nos. 82, 112, 130, 131].

---

[7] Corinne Ball was appointed as the Chapter 11 Trustee (the "**Soundview Trustee**") in the case captioned In re Soundview Elite Ltd. et al., Case No. 13-13098 (REG) (Bankr. S.D.N.Y.) (Jointly Administered).

[8] Judge Gerber "So Ordered" the record, with the expectation that a written order would eventually supplant the record.  (See Composite Dkt. No. 69, Nov. 5, 2014, Hrg. Tr. 67:18–23.)  On June 16, 2015, Judge Gerber entered an order holding Fletcher and certain of his colleagues in contempt.  (Composite Dkt. No. 83.)  Fletcher has appealed that order.  See Fletcher  v. Ball (In re Soundview Elite, Ltd.), Index No. 15-05666 (KPF) (S.D.N.Y.).

3.     **The Disgorgement Motion Appeal**

      In the letter Fletcher submitted to the Bankruptcy Court approximately one hour before the UCBI settlement hearing, Fletcher alleged that the Trustee and various professionals had failed to disclose certain conflicts and sought, among other things, a hearing on those allegations and a stay of proceedings. (<u>See</u> Bankr. Dkt. No. 578, Findings & Conclusions ¶ 1.) The Bankruptcy Court rejected the letter as untimely and inadequate and denied Fletcher's request for a stay, and directed him to file proper motion papers. (<u>Id.</u> ¶ 2.)

      On March 21, 2014, Fletcher filed what the parties refer to as his "Conflicts Motion," which consisted of a notice of motion with a copy of his previously-rejected letter to the Bankruptcy Court attached. (Bankr. Dkt. No. 481.) In response, the Trustee requested a conference before the Bankruptcy Court. (Bankr. Dkt. No. 477.) The Bankruptcy Court held a telephonic telephone conference on March 26, 2014, and again denied Fletcher's request for a stay, and scheduled a further status conference for April 2, 2014. The Bankruptcy Court also directed Fletcher to file a chart listing each party, what each supposedly did wrong, and the relief being sought as to each. (Bankr. Dkt. No. 578, Findings & Conclusions ¶ 4.) In response, Fletcher filed his "Table of Fiduciary Connections

in Fletcher International, Ltd. and Associated Cases" (the "**Table**").  (See Bankr. Dkt. No. 493.)

At the April 2, 2014 conference, the Bankruptcy Court rejected Fletcher's Table as deficient and directed him to file a brief identifying the relevant statutes and specifying how each party failed to comply with them and the specific relief he was seeking as to each.  (Bankr. Dkt. No. 578, Findings & Conclusions ¶ 5.)  Fletcher was given 30 days to file a proper brief (i.e., until May 2, 2014).  (Id. ¶ 6.)  Fletcher did not file his brief by May 2, 2014.  (Id. ¶ 7.)  He never did so.

On May 2, 2014, the Trustee and each of his professionals filed final fee applications.[9]  On May 21, 2014, Fletcher filed his so-called "Disgorgement Motion."  Though styled as a motion, it was filed in response to the fee applications and was more properly characterized as an objection to the fee applications.  (Bankr. Dkt. No. 544.)  Rather than comply with the Bankruptcy Court's directive to file a properly-supported motion, Fletcher again simply attached a copy of his previously-rejected Conflicts Motion (i.e., a copy of his March 19 letter and his April 1 Table).  (See id.)

On June 17, 2014, the Bankruptcy Court held a hearing to consider the fee applications and the Disgorgement Motion.  The Bankruptcy Court rejected

---

[9] At the request of the U.S. Trustee, the Trustee amended his application and sought only interim relief.

Fletcher's Disgorgement Motion and approved all of the fees sought by each of the Trustee's professionals.  (See Bankr. Dkt. Nos. 578, 581.)  The Bankruptcy Court also approved the total amount of the fees the Trustee requested, but directed that a portion be held back pending approval of the Trustee's final fee application. (Bankr. Dkt. No. 579.)  Among other things, the Bankruptcy Court found that:

- Disagreement over the conclusions reached by the Trustee and his professionals with respect to Fletcher's fraud was not a valid basis to object to the professionals' fees.  (Bankr. Dkt. No. 577, June 17, 2014, Hrg. Tr. 38:2–7.)

- The Professionals all performed their roles appropriately. (Id. 38:8–18.)

- Fletcher had failed to file his Conflicts Motion in accordance with the procedures put in place by the Bankruptcy Court.  (Id. 39:23–40:8.)

- Notwithstanding, the Bankruptcy Court saw no plausible allegations to cause it to believe that there was any material issue of fact as to any conflicts involving the Chapter 11 Trustee.  (Id. 40:9–12.)

- The Trustee had no interest in the outcome of the Dakota litigation (the source of the supposed conflicts) any more than the Bankruptcy Court does.  (Id. 40:13–41:7.)

- The Trustee appropriately exercised his professional judgment in conducting his investigation.  (Id. 41:8–14.)

Fletcher appealed, and on September 9, 2015, Judge Sullivan issued his memorandum and order rejecting Fletcher's appeal and affirming the Bankruptcy Court decision.  See Fletcher v. Davis (In re Fletcher International, Ltd.), Index No. 14 Civ. 6070 (RJS) [Dkt. No. 16] (S.D.N.Y. Sept. 9, 2015). Among other things, Judge Sullivan found that:

- The Bankruptcy Court had not abused its discretion in rejecting Fletcher's untimely and unsupported disgorgement motion for repeatedly failing to comply with the Bankruptcy Court's orders. (Id. at 11–14.)

- Fletcher's "interest and the estate's interest are not identical. [Fletcher] is one of many individuals asserting a claim to a portion of the estate.  The Trustee's obligation, and that of his appointed professionals, is to make decisions in the best interest of the estate's creditors and investors as a whole, not to do what is best for [Fletcher] alone.  In fact, once the Trustee found that [Fletcher] had defrauded

his investors and creditors, the Trustee's interest and those of his professionals necessarily became adverse to [Fletcher's]."  (Id. at 15–16.)

- "FILB is not a party to the Dakota lawsuit and the lawsuit was not listed as an asset or an ongoing litigation on FILB's schedules and statement of financial affairs."  (Id. at 16.)

- Any purported connection to the Dakota does not create an interest adverse to FILB, and the fiduciaries had no reason to list any alleged connections on their disclosures.  (Id.)

- Neither the Trustee nor his advisors (Luskin, Stern & Eisler LLP and Goldin Associates LLC) holds or represents an interest that is adverse to FILB.  (Id. at 16–20.)

- "Although the Bankruptcy Court gave [Fletcher] every opportunity to demonstrate how the fiduciaries had conflicts of interest and why their compensation ought to be disgorged, [Fletcher] put forth no credible arguments."  (Id. at 21.)

- At least three separate U.S. District Court Judges in the Southern District of New York have denied various appeals by Fletcher, including Fletcher's allegation that fiduciaries in a related

bankruptcy proceeding failed to disclose purported connections to the Dakota litigation.  (Id. at 11 n.4.)

In reaching these conclusions, Judge Sullivan considered and specifically rejected each of the alleged conflicts that Fletcher relies on in his current appeal.[10]  (See id. at 16 and 19 (rejecting purported conflicts arising out of alleged relationships with Credit Suisse and D.E. Shaw).)  Fletcher has appealed Judge Sullivan's decision.  The Plan Administrator believes that this appeal, like all his others, will be unsuccessful.  Fletcher's brief is due by November 20, 2015.  See Fletcher v. Davis (In re Fletcher International, Ltd.), Index No. 15-2991 (2d Cir.) [Dkt. No. 12].

## **Standard of Review**

This appeal is of a routine Bankruptcy Court order approving a settlement.  Under well-settled law, the settlement is relegated to the Plan Administrator's discretion and business judgment, and the Bankruptcy Court's review of the settlement is quite limited:  does the settlement fall below the lowest point in the range of reasonableness?  The appeal raises no new questions of law, and the finding of reasonableness is a mixed finding of fact and law that cannot be disturbed unless there has been a clear abuse of discretion by the Bankruptcy Court.  The record is devoid of any such evidence.

---

[10] As noted above, Fletcher attached a copy of his appellate brief he filed before Judge Sullivan to his objection to the Credit Suisse Settlement.  (See Bankr. Dkt. No. 631.)

A District Court reviews a Bankruptcy Court's findings of fact for clear error. Franklin v. Residential Capital, LLC (In re Residential Capital, LLC), No. 13 Civ. 8317 (PAE), 2014 U.S. Dist. LEXIS 60828, at *11 (S.D.N.Y. May 1, 2014). Conclusions of law are reviewed de novo. Pleasant v. TLC Liquidation Trust (In re Tender Loving Care Health Servs.), 562 F.3d 158, 161 (2d Cir. 2009). The determination being appealed here is the Bankruptcy Court's approval of the Plan Administrator's settlement with Credit Suisse pursuant to Bankruptcy Rule 9019. "The Second Circuit has determined that such a determination is a mixed question of law and fact which is predominantly factual in nature; the Court therefore reviews 'for abuse of discretion the reasonableness of the Bankruptcy Court's application of the Rule in approving the Settlement.'" Strawbridge v. Messer (In re Strawbridge), No. 11 Civ. 6759 (PAE), 2012 U.S. Dist. LEXIS 29751, at *13 (S.D.N.Y. Mar. 6, 2012) (quoting Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 461 n.13 (2d Cir. 2007)). A Bankruptcy Court abuses its discretion "if no reasonable person could agree with the decision to approve the settlement." Id. (citations and brackets omitted). There is absolutely no basis for making such a finding in this case.

## Argument

### I.   THE COURT SHOULD REJECT FLETCHER'S APPEAL

#### A.   The Bankruptcy Court Applied the Proper Legal Standard

Fletcher incorrectly argues that the Bankruptcy Court should have applied Section 363 of the Bankruptcy Code.  (<u>See</u> App. Br. at 5, 11.)  That section applies to the sale of a debtor's assets conducted by a Trustee <u>after</u> the debtor has filed a bankruptcy petition.  It has no bearing on a pre-petition sale of assets or on a post-petition settlement.  Rather, settlements are evaluated under Bankruptcy Rule 9019(a) and the familiar factors set forth in <u>Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414 (1968).

Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." In deciding whether to approve a compromise, "a bankruptcy court must determine whether the compromise is reasonable," <u>Saccurato v. Masters, Inc. (In re Masters, Inc.)</u>, 149 B.R. 289, 292 (E.D.N.Y. 1992), and whether the compromise is "'fair and equitable' and 'in the best interests of the estate.'"  <u>In re Drexel Burnham Lambert Group, Inc.</u>, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (quoting <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.</u>, 390 U.S. at 424).

In determining whether a proposed compromise and settlement is fair and equitable, a court should consider the following interrelated factors:

(1)    the balance between the litigation's possibility of success and the settlement's future benefits;

(2)    the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

(3)     the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

(4)    whether other parties in interest support the settlement;

(5)    the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

(6)    the nature and breadth of releases to be obtained by officers and directors; and

(7)    the extent to which the settlement is the product of arm's length bargaining.

In re Iridium Operating LLC, 478 F.3d at 462 (citing In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).  In assessing whether a compromise should be approved, a court is not required to conduct a "mini trial."  In re WorldCom, Inc., 347 B.R. at 137.  Rather, the "'Court need only canvass the issues' to determine if the 'settlement falls below the lowest point in the range of reasonableness.'"  Id. (quoting In re Teltronics Serv., Inc., 762 F.2d 185, 189 (2d Cir. 1985)).  As the Bankruptcy Court properly found, each of these factors overwhelmingly supported approval of the Plan Administrator's settlement with Credit Suisse.

### B.     Fletcher Offers No Competent Evidence That the Settlement Was Anything Other Than at Arms' Length

Fletcher's chief complaint is that the Plan Administrator's settlement with Credit Suisse was not negotiated at arms' length.  In support, he rehashes the same unsupported and conclusory allegations in his Conflicts and Disgorgement Motions that have been rejected by every court that has considered them.  The Bankruptcy Court's holdings are law of the case and cannot be collaterally attacked here.

As Judge Sullivan properly noted in rejecting Fletcher's prior appeal, allegations that the Plan Administrator's prior law firm has connections with allegedly adverse parties or that the Plan Administrator sat on a board with an allegedly adverse party is insufficient to create a conflict of interest.  See Fletcher v. Davis (In re Fletcher International, Ltd.), Index No. 14 Civ. 6070 (RJS) [Dkt. No. 16 at 17–18] (S.D.N.Y. Sept. 9, 2015) (rejecting Fletcher's claims arising out of connections to the Plan Administrator's former law firm because the Plan Administrator did not "*himself* . . . presently hold or represent an interest adverse to the estate" and out of allegations that the Plan Administrator previously sat on a board with allegedly adverse parties).

Regardless, the Plan Administrator's uncontradicted testimony is that he concluded, based on his independent investigation, that Credit Suisse acted independently and reasonably when it liquidated FILB's account, and the

negotiations between the Plan Administrator and Credit Suisse that resulted in the current settlement were conducted at arms' length.  Fletcher offered no admissible evidence whatsoever (no affidavits, no documentary evidence, no expert testimony), and the Bankruptcy Court appropriately ruled on the parties' written submissions without holding an evidentiary hearing.  See Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re Sagecrest II, LLC), No. 3:10-cv-978 (SRU), 2011 U.S. Dist. LEXIS 3517 at *32 (D. Conn. Jan. 14, 2011) ("[T]here is no legal requirement that a bankruptcy court hold an evidentiary hearing before approving a settlement" where the bankruptcy court has "enough evidence – especially when combined with [its] general knowledge of the facts of the bankruptcy proceeding – to determine that . . . the settlement was fair and equitable under the Second Circuit's factors . . . ." (citations omitted)).

### C.   Credit Suisse Undertook a Reasonable Sales Process, and Fletcher Presented No Evidence of a Better or Higher Bid

Early on, Fletcher informed the Trustee that there might be potential claims against Credit Suisse relating to its liquidation of FILB's ION Shares in connection with the margin call Credit Suisse made to FILB in June 2012.[11] Fletcher has maintained that there was another bidder willing to offer a better

---

[11] Though entirely irrelevant to the instant appeal, Fletcher incorrectly claims that the Trustee withdrew claims worth more than $50 million against Ion Geophysical Corporation.  (See App. Br. at 12.)  In fact, after a bench trial, the Delaware Chancery court awarded FILB only $300,000 in damages.  The Trustee, after consultation with his trial counsel, settled for $500,000 in exchange for the Trustee's agreement not to file an unwinnable appeal.  (Bankr. Dkt. No. 390.)

price.  The Trustee investigated these claims and found them to be baseless.
(Bankr. Dkt. No. 617 ¶ 22; Bankr. Dkt. No. 640 ¶¶ 12–14.)

   The Trustee investigated Credit Suisse's sales process – i.e., how
Credit Suisse liquidated the ION Shares in the margin account.  He obtained
documents from Credit Suisse and engaged in other fact-finding.  (Bankr. Dkt.
No. 617 ¶ 22; Bankr. Dkt. No. 640 ¶ 15.)  Among other things, the Trustee
concluded that Credit Suisse conducted a commercially reasonable sale process,
soliciting bids in the open market, and the price obtained – which included a slight
premium over the conversion price (i.e., six months of dividends) – was a better
price than Fletcher – through his asset management firm, FAM – ever obtained
when it liquidated FILB's positions in the same stock.  Fletcher quibbles that the
Plan Administrator does not "include any verification" of this fact (App. Br. at 13),
but notably, Fletcher does not claim it is untrue, and Turner conceded at the
settlement hearing that FAM never obtained more than conversion value when it
liquidated shares of the same stock.  (See Bankr. Dkt. No. 640 ¶ 16(a); Bankr. Dkt.
No. 617 ¶ 23; Bankr. Dkt. No. 649, Oct 15, 2014, Hrg. Tr. 21:9–14.)[12]

---

[12] Fletcher does not argue that FAM ever obtained more than conversion value when it sold other
ION Shares held by FILB.  Instead, he claims that FAM realized approximately $65 million
profits on the ION Investment.  (See App. Br. at 13.)  Whether that is also true (i.e., that FILB
sold the ION Shares for a profit) does not have any relationship to whether the price obtained
was greater than or equal to conversion value.

In June 2012, Fletcher had asked Del Mar about a possible transaction in which Fletcher would sell the ION Shares while keeping the "upside" by having a right to repurchase the shares.  (See Bankr. Dkt. No. 640 ¶ 14, Ex. C, Deposition of Peter Smith, Mar. 27, 2013 ("**Smith Dep.**") 26:4–12; id., Ex. D.)  Del Mar looked into the possibility of acquiring the shares but ultimately chose not to submit an offer.  (See Bankr. Dkt. No. 640 ¶ 14, Ex. F, Deposition of Peter Wisniewski, Apr. 11, 2013 ("**Wisniewski Dep.**") 111:9–13.)  Indeed, as the Bankruptcy Court properly found, the only bid that Del Mar considered making was for less money than the bid accepted by Credit Suisse.  (Bankr. Dkt. 649, Oct. 15, 2014, Hrg. Tr. 31:1–5; Bankr. Dkt. No. 640 ¶ 14, Ex. D.)  Moreover, to satisfy Fletcher, any bid by Del Mar would also have been subject to a completely unrealistic right on the part of FILB to repurchase the ION Shares, even though there was no chance whatsoever that FILB would have the money to do so. (Bankr. Dkt. No. 617 ¶ 22; Bankr. Dkt. No. 640 ¶ 14.)  Thus, there is no evidence that there ever was a "better bid secured by FILB," as Fletcher now again claims. (App. Br. at 11.)

### D.   The Settlement Avoided Expensive, Time-Consuming, and Almost Certainly Unsuccessful Litigation

Litigation with Credit Suisse over the propriety of the sale of the ION Shares would have been expensive and time-consuming, and almost certainly would have been unsuccessful.  Credit Suisse was entitled under its contract to

liquidate the ION Shares on the open market.  (See Bankr. Dkt. No. 617, Ex. A

§ 7(a)); N.Y. U.C.C. § 9-610.)  It was not obligated to entertain suggestions from

its contract counterparty (FILB), although it did so here.  (See Bankr. Dkt. No.

617, Ex. A § 7(a).)  Nor was Credit Suisse obligated to forbear from liquidating the

shares in the hopes of obtaining a higher price sometime in the future.  (See N.Y.

U.C.C. § 9-627(a); DeRosa v. Chase Manhattan Mortg. Corp., 10 A.D.3d 317, 322

(1st Dep't 2004) (noting that courts will not disturb a foreclosure sale based upon a

challenge to the proceeds recovered, "except in the narrow circumstance where the

price alone is so inadequate as to shock the court's conscience").  The Plan

Administrator therefore concluded that he had no good faith basis to assert claims

against Credit Suisse based upon the agreements that are the subject of the

Settlement Agreement.[13]  In any event, even if there were colorable claims, as the

Bankruptcy Court properly found, it would take time and money to pursue them,

the outcome would almost certainly be a loss for FILB, and Credit Suisse would

further deplete the settlement proceeds defending any such litigation.  (Bankr. Dkt.

No. 649, Oct. 15, 2014, Hrg. Tr. at 33:8–20.)

---

[13] Fletcher also apparently believes that the Plan Administrator should have pursued claims
against D.E. Shaw.  (See App. Br. at 12.)  This is a red herring.  While there is no basis to assert
claims against D.E. Shaw and the Plan Administrator has no intention to do so, in fact, the
release in the Settlement Agreement does not cover D.E. Shaw.  (Bankr. Dkt. No. 617, Ex. B
(Settlement Agreement) ¶ 5(a).)

## <u>Conclusion</u>

For the foregoing reasons, the Court should affirm the Bankruptcy

Court Order approving the Settlement between the Plan Administrator and Credit

Suisse.

Dated:     New York, New York     Respectfully submitted,
     October 30, 2015

     LUSKIN, STERN & EISLER LLP


By:  /s/ Michael Luskin
     Michael Luskin
     Lucia T. Chapman
     Stephan E. Hornung

Eleven Times Square
New York, New York 10036
Telephone:  (212) 597-8200
Facsimile:  (212) 974-3205
luskin@lsellp.com
chapman@lsellp.com
hornung@lsellp.com

*Attorneys for Appellee, Richard J. Davis*

## <u>Certificate of Compliance</u>

This brief complies with the type-volume limitations of Federal Rule of Bankruptcy Procedure 8015(a)(7)(b) because this brief contains 7,489 words excluding the parts of the brief exempted Federal Rule of Bankruptcy Procedure 8015(a)(7)(b)(iii).

This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in proportionally space typeface using Microsoft Word 2012 in 14-point Times New Roman Font.

Executed:   New York, New York
            October 30, 2015


    /s/ Michael Luskin
Michael Luskin

*Attorney for Appellee, Richard J. Davis*